Case number 18-7055. Farhad Azima v. Rak Investment Authority Appellant. Ms. Goldstein for the appellant, Ms. Ferguson for the appellant. Good morning. Good morning, Your Honors. May it please the Court. Linda Goldstein for the appellant, Rak Investment Authority. The question on this appeal is whether any United States court has the authority to hear a lawsuit alleging that Rak Investment Authority hacked plaintiff's laptop computers. We submit that no U.S. court can hear this lawsuit, or the allegations in it, which I should underscore, Rak Investment Authority vehemently denies, for two reasons. The first, lack of jurisdiction under the Foreign Sovereign Immunities Act. And second, the party's written agreement that this dispute must be decided under English law in an English court, where Azima's false allegations of computer hacking are currently being litigated and where they're going to be tried commencing in January of 2020. Could we read your brief as agreeing that Rak is waiving its sovereign immunity against a counterclaim for damages in the English action? Yes or no? That is correct, Your Honor. Yes, you are waiving, so there will be no assertion of sovereign immunity. That is correct, Your Honor. And that necessarily flows from the party's forum selection agreement, where we agreed to submit to jurisdiction in England, and the English State Immunities Act provides that submission to jurisdiction. There's a separate question of whether it would allow this type of counterclaim. That's what was very much debated, and whether you could have submitted to that but retained your sovereign immunity against counterclaims. And so that's why I was trying to be very specific that you are agreeing that you would have no sovereign immunity claim against a counterclaim for monetary damages based on the hacking, not the evidentiary issue that's there now, the counterclaim. Correct, Your Honor. And there really was no debate on that point in the district court. We said that the case should be brought in England. We submitted the forum selection clause with the submission to jurisdiction. It's all very different than waiving sovereign immunity from a counterclaim, but I appreciate you've made the statement. We would not ask that literal question, Your Honor. We believe it was implicit. People can volunteer. We believe it was implicit in our submissions, Your Honor. Implicit never works for waivers of sovereign immunity. It's explicit now, Your Honor. It's explicit. Got it. To begin with, the United States Foreign Sovereign Immunities Act, where we have not waived sovereign immunity. Zima is trying to jam the proverbial square peg into a round hole by invoking the commercial activities exception as a basis for foreign claims based on alleged computer hacking. We submit that there are three reasons that the case does not meet the commercial activities exception. First, there is no commercial activity by the foreign sovereign. Second, there is no connection between his claims and the relevant purported commercial activity. The foreign sovereign here is the Sovereign Wealth Fund. Correct, RAC Investment Authority. Does it do anything but commercial activity? It's a Sovereign Wealth Fund. It develops the economy within the sovereign territory of RAC, so that would be sovereign activity. But, yes, it does engage in multiple commercial activities. The key question for the Foreign Sovereign Immunities Act is whether the claim is connected to that activity. To start with first principles, the commercial activity exception is the codification of the restrictive theory of sovereign immunity, which allows a sovereign to be sued in the United States for its private or its commercial acts. And there are three prongs. And the first prong has been before the Supreme Court a couple of times, and the Court has held that the connection between the claim and the commercial activity must be very strong. The connection is that the claim, or the commercial activity, rather, must be the grabber of the claim. And an equally strong bond exists between the claim and the commercial activity in the second and third prongs of the commercial activity exception. And there it's based on the connection between the act on which the claim is based and the commercial activity. And every court of appeals that has looked at this issue has said there must be a substantive, a causal, or a material connection between the act and the commercial activity. And no such connection has been forged here. Do you agree that the authority was engaged in some commercial activities with Mr. Azima? There were commercial activities such as the joint venture, obviously. It was commercial. We have not denied that. Where there is a factual dispute is on the only commercial activity that the amended complaint asserts is connected to the alleged hacking. And that is the assistance that Mr. Azima provided in negotiating with Qatar Mossad. But paragraph 64 of the complaint does a lot more than that. It lists the joint venture as well as the negotiation as amongst the commercial activities in which they were engaged and for which the hacking was undertaken to give the authority allegedly more control. It lists those activities to be sure. But paragraph 56 says specifically it was connected to what it calls Rekia's commercial agreement to have Mr. Azima serve as a mediator. And there is a factual dispute on that issue, which we raised by submitting the declaration of Mr. Buchanan, who said there was no commercial engagement. So if you told the district court you weren't making a factual challenge, you were only making a facial challenge. That's not correct, Your Honor. We made a factual challenge. When did you make that factual challenge? By submitting his declaration when we submitted our moving papers. What paper was it submitted with? It was submitted with our moving papers. With the opening or the reply? With the opening papers. And did you make an argument in your opening papers that you were making a factual argument? We made... Because my understanding from the district court's questioning as well is that it didn't show, it wasn't made until your reply brief. There is one point that I believe Mr. Azima makes, which he says was made too late. If I may, the facts surrounding Mr. Azima's, I guess, the nonengagement, his role, that was all spelled out in the Buchanan declaration, and it was extensively briefed in our moving brief. But the Buchanan declaration doesn't attend to the accusation that's made with regard to Gerard. Yes, it does. It says that there was a meeting. It just says no one did it except that it's, it doesn't really join issues. It said there were two lawyers. The factual determination to be made, it does not clearly refute what they're claiming. I mean, I think if you have an argument, the direct effect is your argument to be made, but that's up to you. The connection certainly looks like it's there enough to be able to get to the next question, I think. Your Honor, there was a meeting. It was in July of 2016. Mr. Buchanan testified that two lawyers attended the meeting. I suppose we wanted to be circumspect and we didn't mention Mr. Gerard. By name, Mr. Gerard's name does appear in an earlier declaration that's part of the record, the Fotherby Declaration, which identifies Mr. Fotherby and Mr. Gerard as being the two lawyers from Deckert who were at that meeting. Mr. Buchanan says in no uncertain terms that so-called threat of collateral damage was not made. So is the authority's position, let me clarify for me, that Azima was or was not providing negotiation assistance to the authority in regard to this matter? He was providing negotiation assistance, but that negotiation was to the authority. He was to both parties, Your Honor. He said he wanted to serve as an honest broker. That's undisputed, Mr. Azima. I don't want you to talk about what he was doing for the other party. You don't get to speak to that. So he was providing negotiation assistance to the authority in conjunction with this dispute with Mr. Massad. Correct or not correct? He was serving as an intermediary. He set up meetings. He was providing negotiation assistance to the authority in conjunction with the Massad dispute, yes or no? Which he was, and that's very different from being engaged to serve as a commercial mediator. It's undisputed. He did not ask for money. He did not receive money. He has sued in the United States. He has not asked for money here from Mediation Services. He's in litigation with us in the United Kingdom. He asked and asked for money from Mediation Services. But his involvement is cited as one of the reasons for the inducement of the settlement agreement, right? It was something of value that was given. It is a subject matter of the settlement agreement. And this gets to the core contradiction in the district court's analysis. If we take Mr. Azima's allegations on their face, that his negotiation assistance was a commercial activity, and that the hacking was connected to that commercial activity, then this case necessarily falls within the forum selection clause that the parties agree to, because as Your Honor just pointed out, the negotiation assistance is mentioned in the settlement agreement, and therefore the negotiation assistance is one of the subject matters of the settlement agreement. Or at the very least, it's in connection with the formation of the agreement, right? Absolutely, Your Honor. Absolutely. And if we agreed with you on the forum nonconvenience argument, we wouldn't need to deal with the forum settlement agreement. That's correct, Your Honor. That's the Supreme Court's holding in Sinochem. And in Sinochem, the court, in fact, said that if the issues on the jurisdictional – So what's your strongest argument about the forum selection clause? On the forum selection clause, that Mr. Azima has pleaded himself into it. Say that again? He has pleaded himself into it by saying that the hacking was connected to the negotiation assistance or by saying that it was connected to the negotiation of the settlement agreement itself. He has pleaded himself into the forum selection clause because those subject matters relate to the formation of the settlement agreement and its subject matter and are therefore covered by the clause. In addition, he has alleged a claim of unfair competition, asserting that he was disparaged by having his data placed on the Internet. And there's a non-disparagement provision, a mutual non-disparagement provision, in the settlement agreement. And any claim that he was disparaged by RAC Investment Authority after the date of that settlement agreement and the posting on the Internet took place five months later would fall squarely, squarely within that clause. If I can address direct effect for a moment. Mr. Azima had three bites at the apple here. It was lucidly clear that to allege a direct effect, he had to allege that his computer was in the United States at the time it was hacked. He put in his first complaint. His first complaint said nothing about it. The district court directed him to spell out the factual basis for his foreign sovereign immunity exception. And he did not say where his laptop was at the time of any of the alleged hacks. That was his second bite at the apple. We then submitted our motion to dismiss, pointing out that he had not alleged where his any of the alleged hacks. And he did not provide any kind of response. All we have is that his laptop is U.S. based. Laptops are inherently portable. Mr. Azima has a home in London. He spends his summers in Paris. He has a home in Missouri. I mean, the portability argument cuts both ways. Why isn't a reasonable inference from U.S. base for someone who lives in the United States that during, I think, I'm sorry, was it an 18 or 14-month period, 11-month period, it's a long period while this hacking continued, that he was in the United States during some point, including the fact that the record shows that he was in the United States during some of that time period. Because part of the guarantee of the Foreign Sovereign Immunities Act is that the foreign sovereign is protected, not just from liability, but also from becoming embroiled in U.S. litigation unnecessarily. And what the district court was doing, because this fact is within Mr. Azima's control, let there be no doubt about this, he submitted the declaration of an expert who had 23 years of experience with the FBI who said that he had conducted an extensive forensic examination of Mr. Azima's computers and his cloud-based accounts, and he identified only one hack. And all Mr. Azima had to do was say that he was in the United States on October 14, 2015, and he didn't do that. And he had three opportunities to do that, and he didn't provide a single one. Before your time's up, could you just give me an update on the status of the English litigation? Generally and in particular, as I understand it, it was addressing this hacking, at least in the context of evidentiary admissions. Yes, yes, Your Honor. In September of last year, Mr. Azima amended his defense in the case to raise computer hacking as a defense to the entire case. The case, as I said, has been scheduled for trial in January of 2020. At the moment, the parties are engaged in active discovery. Documents will be disclosed on March 21. Witness statements will be exchanged in May. Expert disclosures will be made through the summer. Am I right? I could very well be wrong that there's a preliminary dispute about whether materials that were discovered during the hack can be admitted into evidence in that proceeding? That is the nature of the defense, Your Honor. That doesn't sound like a defense. That sounds like an evidentiary issue. Well, it's – Will that be decided before – I'm not an expert on English – I'm sorry. I just didn't know if that was going to be decided before trial or that will be something that will be resolved during the trial? At this point, it's going to be resolved during the trial. There's also something called abuse of process, which I don't completely understand, but that's not just directed to the documents, but it's intended to strike out the entire claim. I believe that's also at issue. My time is up, Your Honor, so can I reserve a few minutes for rebuttal? Yes. Thank you. Good morning. May it please the Court. I'm Laura Ferguson, Counsel for Peli Farhad Azima. Based on the questions that I've heard so far, I'd like to address the applicability of the settlement agreements from selection provision and also address direct effects and the relationship between the U.S. litigation and the U.S. litigation. So turning first to the settlement agreement, is our position that the district court correctly interpreted the settlement agreement to unambiguously not apply to the hacking claim? Did we review that de novo? How did we review that aspect of the decision? So the contract, to the extent you can look at the four corners of the contract and conclude that it's unambiguous, that is a de novo determination. If there's a determination that the contract is, in fact, ambiguous, then there would need to be a remand for consideration of extrinsic evidence. Right, but the district court was doing a facial determination. The district court was doing a facial determination, not considering extrinsic evidence, and decided based on the four corners of the settlement agreement it unambiguously did not apply to the hacking claim, largely because the conclusion of the whereas clause says that the parties wished to resolve all outstanding disputes related to the joint venture agreement. That's the 2007 joint venture agreement. Now, Roth, you have points. As I recall, she didn't grapple at all with the language of formation in the settlement agreement, right? I don't remember any analysis in there about the... Yeah, but there's nothing one could conclude from the four... Wouldn't that be REC's strongest argument here for... Well, you would have to look at the four corners of the settlement agreement or else we're concluding that it's ambiguous and we're going to consider extrinsic evidence, in which case this is entirely inappropriate as an exercise of supplemental appellate jurisdiction because now we have a messy factual issue that in any event should be decided by... I miss it. If we were to look at the language of the forum selection clause, this settlement agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation, and I don't... The complaint alleges that the hacking activity does not arise out of the settlement agreement. It doesn't discuss the settlement agreement. It says that the hacking arose out of the mediation and the breakdown of that mediation. Right, and that's referred to in the whereas clause. Right. That's referring to the breakdown of the mediation. It's not referring to the breakdown of the mediation. It's a sort of general background recitation of facts, as you'd often see in a settlement agreement. It's just referencing that Mr. Azima had played this role. It's not suggesting there's any dispute. Doesn't it suggest that that interchange, that that relationship that came out of the mediation agreement is related to the settlement agreement? I mean, it's part of why the settlement agreement was formed, but now we have language in the forum selection clause that says if there's a dispute arising out of the formation of this agreement and part of this agreement involves the negotiations, why isn't that clearly... We don't have to look outside the court formation. At the very least, what would create the ambiguity is the clear statement that the dispute that the parties are resolving are issues related to the joint venture agreement. And I would also add, I think this is... I thought the point of a whereas clause was to say, here's why. But that doesn't mean that anything tangentially related to... Not tangentially, it's mentioned specifically in the whereas clause. No, but the hacking is not expressly mentioned, right? That's why the complaint doesn't work for you in paragraph 64 when it says the hacking was intended to interfere with commercial activities, plural, and lists those commercial activities, both this mediation and his role in the joint venture. The complaint alleges that the hacking is the commercial... related to the commercial activity that gave rise to the direct effects in the U.S. I mean, the hacking is the very commercial activity that the complaint is talking about. And I think if one interpreted the settlement agreement... If I'm misreading paragraph 64, please tell me. It says, I'm engaged in all these commercial activities, plural, and listing specifically, amongst other things, the joint venture, which the settlement resolved, and the mediation. And that the actions of this hacking were intended to cause and inflict harm and damage because of, related to, and in connection with the commercial activities, plural, that were just listed. The complaint, elsewhere, more specifically ties the hacking to the mediation. So I think some of these other commercial relationships are sort of referenced, put in context, that the overall relationship with Rakhia and Mr. Azima tended to be commercial in nature, but this lawsuit arises out of a particular interaction, which was the mediation. And the mediation is only referenced by way of a background recital in the settlement agreement. And if one were to interpret the settlement agreement to include the hacking claim, to determine from the settlement agreement that the parties, when they sat down to negotiate this, intended to settle a hacking claim, or to include within the scope of the agreement a hacking claim, then presumably it would come within this language on 3.1 of the settlement agreement. Why does it have to be a hacking claim as opposed to something tied to the joint venture or to the negotiation role that he had? Why wouldn't either, as long as the charge, the complaint is about, the dispute is about the role of the hacking in either or both of those ventures, would it be within the forum clause? If the complaint focused on the connection between the hacking and the resolution of the joint venture agreement, I think there would be a stronger case. But the complaint instead focuses and alleges that it's the mediation and the breakdown of that mediation that gave rise to the hacking complaint claim. What was the point under the complaint, what was the, the hacking started before, did it start before the mediation? The hacking started in September 2015, a few months after the, it was hard to pin down the exact timing of when the mediation started, but the complaint alleges that the hacking starts a few months after the mediation began. And where was the joint venture negotiation in that same time frame? The joint venture negotiations, I think they're perhaps December 2015, there were maybe some discussions on that. That was going on at the same time too. Correct. They were all going on, the briefings were going on at the same time. If one interprets the settlement agreement as encompassing disputes that arose out of this mediation relationship, then 3.1 would say that the settlement agreement is in full and final settlement of all claims, whether or not presently known to them or to the law that Mr. Azim or Heavy Lift would have. Right? So if this settlement agreement was intended to be all-encompassing and not just settle the joint venture claim, then Rocky would be arguing you don't have a hacking claim to bring to England. You've settled it. But that's not what they're saying. I think they know that's a bridge too far. So if the hacking claim wasn't resolved by the settlement agreement, why does a foreign selection provision apply? Did the settlement agreement happen, was he aware? No, was he aware of the hacking at the time he signed the settlement agreement? Was he aware of the hacking at the time? He was not. Right. He was not. Right. So the question isn't whether the hacking was covered by the settlement agreement. It's whether the things that the settlement agreement covers were the things that the hacking, the activities that the hacking also happened to be targeting. It's two commercial roles. Well, again, the complaint focuses on a specific commercial role, and the settlement agreement is about an entirely, I would say, separate commercial relationship. But I think where this leads us is that the district court has looked at this agreement and concluded that it unambiguously did not apply to the mediation relationship or hacking claim that would arise out of that. And so if you're looking at the agreement and concluding something different, I would argue that there's now been a finding of ambiguity, and this is not something that can be resolved by the court of appeals, that there needs to then be a remand to the district court for consideration of extrinsic evidence. What do the parties really mean? Because you could read this agreement both ways. I mean, we maintain with the district court that it should be read to exclude this hacking claim, that the form selection provision, which covers the subject matter of the settlement agreement, that that's the joint venture, not the mediation. But if that's for Rakhia, I believe we have an ambiguity, which would require a remand, which means that this is not an issue that can be terminated on appeal. So therefore, there's not a grounds for this court to exercise supplemental jurisdiction. There's not the inextricable entwinement, and it doesn't meet the test that if the court takes it up and decides in Rakhia's favor, it would completely terminate the action, because at best there would be ---- Why is that not the case? If we disagreed with the analysis of the district court, if we thought she had overlooked the role that formation is supposed to play in this, for example, and we thought it was clear from the face that the form selection clause applies, why wouldn't that resolve the case? I was positing that you agreed there was an ambiguity. I see. I'm sorry. If you agree it's unambiguous, I agree I have more of a problem. I got you. Okay. Okay. Turning to what's happening in the U.K. proceeding, I think it's important to note that Mr. Azima has not brought a counterclaim for damages for hacking. It's called a defense in the U.K. system, but you should think of it as a motion to eliminate. He's saying that when Rakhia is pursuing this claim against me, they should not be allowed to introduce into evidence. Why hasn't he brought a counterclaim, too, just to protect himself on two fronts? I mean, it's not clear that that's even allowed under U.K. law. The only case they cited involved the Daily Mail scandal where there was phone hacking of a number of British celebrities, which is an entirely different situation from whether a U.K. court would take jurisdiction over a computer hacking claim brought by a U.S. citizen against a foreign sovereign where it has no nexus to the United States, unless it also concluded that the form selection clause didn't apply. But as in that, there would be no reason for that claim to be heard in the U.K. Are you questioning whether there's – so you're not questioning the waiver of sovereign immunity. You agree that they're not asserting sovereign immunity for it, and your position would be that if the form selection clause applied, they still wouldn't let you bring this claim? They never had clearly waived sovereign immunity before. Now I hear them to be saying if the form selection provision applies to this claim and Mr. Azima litigates it there, we would agree to be bound by the form selection provision. I heard them expressly waive sovereign immunity without any such conditions. I heard it tied to the fact that they had entered into this contractual agreement, that that was the basis for their waiver. Turning to the – I was actually wondering why they would have ever entered into that agreement. Right. That's a different question. Turning to the foreign sovereign immunity issues, in terms of the commercial aspect of it, whether the activity was commercial in nature, there was a factual attack on that question, and the district court weighed the evidence. It weighed Mr. Buchanan's declaration and his characterization of the relationship against contemporaneous email, and in weighing the evidence concluded that Mr. Azima was, in fact, fulfilling a mediation role, which is inherently a private role. It's not an inherently sovereign role. And that finding would be – could be reversed only for clear air. With respect to the other elements, the in-connection within the direct effects, Rakhia, in fact, did make only a facial attack, as they squarely announced. On their reply brief, they raised this notion of whether the threat was made at the meeting. That was argued for the first time on reply. We would argue that the complaint more than sufficiently alleges a connection between the mediation and the hacking, and in addition more than sufficiently alleges that the hacking caused an effect in the United States. Where is that more than sufficient allegation of direct effects in the U.S.? So the complaint in paragraph 78 alleges a hack of Mr. Azima's, quote, U.S.-based business and personal laptops. What does it mean for a laptop to be U.S.-based? I would have thought the complaint would have quite easily just said, and the hack occurred during times when his laptops were in the United States. Well, so the hacking occurs over an extended period of time. Mr. Azima is a U.S. resident. There was also a clarification at the hearing on the motion to dismiss that, in fact, they're desktops that he has, not a laptop. So that's in the record. So these are desktop computers, not laptops? These are desktop computers, although the complaint alleges that. On a desk in Missouri? Yes, correct. Where is that in the record? So that's at JA 1205 and 1206. It's the motion to dismiss hearing where Mr. Azima's counsel clarified that, in fact, the computers were desktop computers. The complaint alleges computers in the U.S. or, at one point, U.S.-based business and personal laptops. But there was a clarification at the hearing before the judge that they were, in fact, desktops. And, again, that's at JA 1205, 1206. But in any event, there's certainly the court could draw a plausible inference from the allegations of the complaint that Mr. Azima, as a U.S. resident, aware the hacking occurred over an extended period of time, some of which he was definitively in the U.S. For example, at JA 1428, there's an email referencing November 2015 discussion in Mr. Azima's Kansas City home. So that was during the period of the hacking. That ties him, even if you go with the laptop theory, that ties him to the U.S. during a period of hacking. Certainly, Rocky knew that Mr. Azima was a U.S. resident. The settlement agreement lists his Kansas City address as his main address. So for purposes of surviving a motion to dismiss under the Trombley-Iqbal standard, I think we more than sufficiently allege that the computers were U.S. computers. And certainly there is no difficulty seeing how hacking directed at a U.S. computer would meet this. Can the fact that they were desktop computers in the U.S. be considered since it was in a briefing paper and it's not in the complaint? I'm trying to figure out whether that can even be credited. Well, it was representation by counsel at the hearing on the motion to dismiss. What's the law about that? Does that amend the complaint? I honestly don't know. I will say that even if one assumes they're laptops, there is sufficient evidence that Mr. Azima spends enough time in the United States and is a U.S. resident that is a highly plausible inference that during the period from September 2015 to I think it was August 2016 of the hacking, that he was in the U.S. during some of that period, and Rocky would have expected him as a U.S. resident to be here. So in the same way that in the Petrobras case that the court recently decided, where there was a fraud that was in a sense directed at U.S. investors because Petrobras knew the investors were U.S.-based, here the hacking was directed at what was known to be a U.S. resident and would be known to affect as U.S. computers. And that's your only argument on effects, that he had laptops and one should assume that sometimes those laptops were in the United States? That's it? Well, that it damaged his laptops and installed malware on his laptops. It disrupted his business, which is U.S.-based. So a disruption of his business, disruption of his computers, stealing of his data. What is the allegation with respect to disrupting U.S.-based businesses? Let's see. Paragraph 76 alleges unauthorized, I'm quoting, unauthorized access occurred in the United States and the damage to Mr. Azima's businesses occurred in the United States. What is that damage? Is there any allegation with regard to that? That doesn't mean anything. I mean, certainly there's allegations in terms of how the data was deployed. It was posted on websites and there was a risk that it was going to interfere with his reputation. No, I'm just asking, I don't know what the answer is. I couldn't find it. Is there any allegation with respect to how a U.S.-based business was damaged? Well, for example, there was a period when he could not use his computer. Is that in the U.S.? Is there any allegation about it? I don't know that it's – it talks about his need to repair his computer and the damages associated with that. And I think it's a plausible inference. There really are no allegations with respect to U.S.-based businesses and how they may have been adversely affected. Only to the extent one infers from the fact that Mr. Azima is a U.S. resident and spends most of his time here that the widespread hacking of his computers, which he uses for his business and the theft of his data. Yeah, but there's no connection to any business that we're talking about. He has businesses overseas, too. The main focus of the direct effect is so we don't get off on a tangent. I mean, the main focus is on the damage to the computer and the theft of data. Does he have businesses in the U.S.? The complaint, I think, is not specific about exactly where his businesses are located. Does he have businesses in the U.S.? Can you answer that? And he certainly does business from the United States in terms of where particular businesses are incorporated. I can't speak to that. We don't even know that he has a business in the U.S. that would have been affected. He certainly operates his business out of the U.S. in terms of whether a particular heavy lift or something is incorporated in the United States. The complaint doesn't address that. So, I mean, you're answering us by saying our allegation is he owns laptops. He's sometimes in the U.S. in the laptops. You should assume that those laptops that he owns were adversely affected, period. That's it. There's no connection to any business. Well, it is a hacking claim. So it's under a federal statute that provides a U.S. citizen a federal cause of action when their computers are hacked. So the focus is what's happened to your computer. I mean, this is a crime that relates to computers. So I think the complaint more than sufficiently establishes that the computers were in the U.S. for at least some of the relevant period and were known to be the computers of a U.S. resident. They've been expected to be in the U.S. So I think when you look at it, consider the claim that's being brought. I mean, it's a claim about improper access to his electronic data and the hacking of his computer. That is the gravamen of the complaint. So, therefore, the direct effect relates to the computer because that's what the claim is about. The complaint doesn't say X laptop and computer was in the United States during this period and there was hacking that adversely affected it. I mean, that's the commission. It certainly does allege that the hacking. You're wanting us to draw big inferences. I don't know. He's in a lot of places. Why wouldn't we assume? We don't know whether he brings his laptops with him when he comes to the United States because we don't even know that he has any businesses in the United States. Well, I mean, we could remand for a further amendment of the complaint to clarify that the laptops are, in fact, desktops. That they're in fact desktops in the U.S. But leaving that aside, I think given the extended period of the hacking and that Mr. Azeema was in the record in the U.S. during some of that period, that's sufficient because it's a claim about his computers. I see my time is up. Thank you. Ms. Goldstein, we'll give you back a couple minutes. Yes, thank you. I'll try to speak really fast. Just to focus on direct effect for a moment, this Court's precedents are quite clear that the effect must be both direct and immediate. So if a computer is damaged when it's in Paris or London and then it's brought back to Missouri, that's not a direct effect because the damage happened when it was in Paris or London. There is no desktop computer in the record. The complaint says it was a laptop. Mr. Azeema had an opportunity to fix that when he submitted his options. Did he deny that they made that representation at the hearing? He made that representation and is inconsistent with the subsequent proceedings in the United Kingdom where as part of the disclosures he has described computers as laptops. So that is the representations have been made both ways by this counsel, Your Honor. He, which is something that Mr. Azeema is trying to do here, he first told the district court that there was no connection between this case and the case in England and he's now asserting the very same factual allegations in England. Well, he told the district court he wasn't a mediator. He didn't have anything to do with you. He was working for the other side even when the settlement agreement said the opposite. So it seems like everybody's been trying to have their cake and eat it too. The court did not find that there was any inconsistency. He was providing negotiation assistance and Mr. Buchanan's declaration acknowledges that he was providing negotiation assistance. To the authority? Yes. Well, to both sides, obviously. I should point out on the factual challenge that we made to the complaint, we followed Phoenix Consulting. Phoenix Consulting says you make a factual challenge by submitting factual information. That's what we did. In Phoenix Consulting, in fact, the factual information that was submitted by the Foreign Sovereign was submitted on its reply in response to a claim that the plaintiff had made. So your view is district courts are bound to accept it when a foreign sovereign, having told the district court that it's a facial challenge in its reply, says now I'd like to make a factual challenge even though it's too late for the other side to contest it? We believe that the district court really should not have asked us to make that characterization ab initio. Because of the structure of the Foreign Sovereign Immunities Act, we're immune until the plaintiff makes a showing that we're not. Is there a motion to dismiss on sovereign immunity grounds? You get to tell the district court whether it's a facial or factual. And I don't see where sovereign immunity lets you change your game late in the process. There is no authority that we found, Your Honor, from this court or any other appellate court that requires a foreign sovereign to declare a major in its papers. We did submit a factual challenge by submitting facts. I just want to make sure I'm understanding here. You're saying that something in sovereign immunity allows you to wait until your reply brief to say, oh, we're making a factual argument here? No, Your Honor. And to make that factual argument? No, no. We submitted the facts with our moving papers. Did you make the argument in your opening brief? We made the argument that there was no connection in our moving papers. Did you make the factual argument in your opening brief? We argued in our moving papers that there was no collateral damage threat. Yes, that was in our motion papers. If I could turn for a second back to the other allegations of direct effect, the so-called impact on his business. This court's authorities, in particular Bell Helicopter, make it quite clear that generalized allegations about harm to a U.S. business do not suffice to cause a direct effect. If I could also point out a fact in the record, which Mr. Zima submitted in the district court, which is at page 988, which is an e-mail that Mr. Zima wrote to Mr. Buchanan, where clearly the heavy lift discussions, because he had raised his heavy lift claim, and his initiation of the Qatar-Mossad negotiations are discussed in the same document. So clearly it is related to the formation of the settlement agreement, as we've said before. We have, unless my colleagues have further questions, we have your argument. Thank you very much. The case is submitted.
judges: Griffith, Millett, Edwards